**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No.: 7:24-cr-00780-DCC-1 |
| | ) | |
| v. | ) | **MOTION FOR DISCOVERY IN ANTICIPATION OF FAIR CROSS-SECTION CHALLENGE** |
| | ) | |
| JOSEPH F. WALLACE | ) | |
| | ) | |

The Sixth Amendment to the United States Constitution "secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). *See also*, U.S. CONST. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ."). Mr. Wallace questions whether the jury panel in his case afforded him that right. *See Duren v. Missouri*, 439 U.S. 357, 363–64 (1979) ("In holding that 'petit juries must be drawn from a source fairly representative of the community,' we explained that 'jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.'" (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975))). Notably, a fair cross-section claim

> challeng[es] the pool from which the jury is drawn, and not necessarily the venire panel directly before him. Accordingly, the composition of one panel does not indicate whether a fair cross-section claim exists. The irrelevance of the composition of a single venire panel is underscored by the fact that a petitioner may bring a claim even if minorities are included in his panel. The Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself. *United States v. Biaggi,* 909 F.2d 662, 678 (2d Cir. 1990). The focus, therefore, is on the procedure for selecting juries, and not the outcome of that process.

*Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012) (citation omitted).

Under *Duren v. Mississippi*, to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement, a criminal defendant must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. 357, 364 (1979). Proof of discrimination or any other objectionable motive is not required. *See United States v. Weaver*, 267 F.3d 231, 244 (3d Cir. 2001) ("We must be careful to note that intentional discrimination need not to be shown to prove a Sixth Amendment fair cross section claim." (citing *Duren*, 439 U.S. at 368 n. 26)).

Currently, Mr. Wallace cannot argue that the underrepresentation of Black people in the jury panel from which his jury was selected is due to systematic exclusion of Black people in the jury-selection process. He has no evidence of such. *See United States v. Bryant*, 417 F. App'x 220, 222–23 (4th Cir. 2008) ("[A]ssuming that Bryant is challenging the purported lack of African–Americans, he presents (and the record before us contains) no evidence that the percentage of African–Americans on the jury venire is not fair and reasonable in relation to the community as a whole. Bryant leaves us to speculate about whether the venire was a reasonable representation. Speculation is no substitute for evidence. Even assuming that Bryant had met the first two requirements, he presents no evidence that the alleged exclusion of African–Americans on the jury venire was systematic, rather than a mere statistical anomaly."). There may be evidence that Black people are systematically excluded in the jury-selection process. There may not. Therefore, discovery with respect to the jury selection process is necessary to determine *Duren*'s third prong can be satisfied. *See United States v. Manbeck*, 514 F. Supp. 141, 143 (D.S.C. 1981) ("Pursuant to motions of numerous of the within defendants, the court on January 27, 1981, ordered that the Clerk of the United States District Court for the District of South Carolina make available to the defendants, their

attorneys and investigators, all records relating to jury selection. After the completion of an extensive investigation, a motion was filed on January 29, 1981, by some of the defendants, seeking a stay of the proceedings due to the improper selection of the petit jury.").

Discovery is especially necessary where the selection of jurors for wheels, pools, panels, or venires appears facially neutral. *See United States v. Savage*, 970 F.3d 217, 260 (3d Cir. 2020) ("[F]acial neutrality alone of a selection system is not dispositive."). Cases from across the country found *Duren*'s third prong satisfied after discovery or post-trial revelation of computer glitches or innocuous jury selection practices that resulted in the systematic exclusion of a distinctive group from the jury selection process. *See, e.g.*, *United States v. Erickson*, 999 F.3d 622, 627 (8th Cir. 2021) ("To demonstrate systematic exclusion, Erickson must provide additional evidence in support of his claim, such as a defect in the jury selection process itself that serves to exclude the underrepresented group, that the voter registration requirements impose discriminatory qualifications on applicants, or that the administration of the juror selection plan is discriminatory." (cleaned up)); *United States v. Rodriguez*, 924 F. Supp. 2d 1108, 1115 (C.D. Cal. 2013) ("After Rodriguez challenged the venire, the Clerk's Office comprehensively reviewed its jury selection procedures and instituted several changes. First, during the review, the Clerk's Office uncovered two errors in how its computer systems calculated the race and ethnicity of the jury pools: 1) multiple counting of deferred jurors, and 2) identifying all individuals who failed to answer the race/ethnicity question in the juror questionnaire as 'Non–Hispanic' rather than 'Unknown."); *Ambrose v. Booker*, 684 F.3d 638, 647 (6th Cir. 2012) ("Similarly, in this case, petitioners could not have discovered the computer glitch prior to trial and did not deliberately bypass a jury challenge."); *Weaver*, 267 F.3d at 244–45 ("Under *Duren*, 'systematic exclusion' can be shown by a large discrepancy repeated over time such that the system must be said to bring about the underrepresentation:

'[Here, petitioner's] undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year *manifestly indicates* that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized.' [*Duren*, 439 U.S.] at 366. Thus, while we need not determine the limits of 'systematic exclusion' for our purposes, we note that if the use of voter registration lists over time did have the effect of sizeably underrepresenting a particular class or group on the jury venire, then under some circumstances, this could constitute a violation of a defendant's fair cross-section rights under the Sixth Amendment." (cleaned up)); *United States v. Sanchez*, 156 F.3d 875, 879 (8th Cir. 1998) (suggesting that systematic exclusion may be established by presenting evidence that an underrepresented group "face[s] obstacles in the voter registration process"); *Barber v. Ponte*, 772 F.2d 982, 989 (1st Cir. 1985) ("A large discrepancy occurring over a sustained period of time where there is an opportunity for arbitrary selection is sufficient to demonstrate that the exclusion of the underrepresentation is systematic—that is, inherent in the particular jury selection process utilized."). Thus, the claim, or reality, that jury selection processes are random or handled by computer may not hold true when the curtain is pulled back. Hence the need for discovery.

But, before Mr. Wallace makes such a request, he turns back to the timeliness of this Motion. "Federal Rule of Criminal Procedure 12(b)(3) . . . governs motions raising a Sixth Amendment fair cross-section challenge, and, like [Jury Selection and Service Act] motions, such motions must be filed before trial. Failure to file the motion before trial amounts to waiver of the fair cross-section claim." *United States v. Jones*, 533 F. App'x 291, 300 (4th Cir. 2013).[1] Defense attorneys are not expected to "investigate the jury assembly process in every

[1] "The Sixth Amendment and the requirements codified in the JSSA, 28 U.S.C. §§ 1861–78, are coextensive and guarantee a criminal defendant the right to have a grand jury and petit jury drawn from a fair cross section of the community." *United States v. Rodriguez*, 924 F.

case conditioned upon his client's loss of the right". *Ambrose*, 684 F.3d at 646 (citation omitted). Here, the composition of the jury panel from which Mr. Wallace's jury was selected put defense counsel on notice of a potential procedural irregularity in the process that produced the jury panel. *Id.* at 646 ("It may be true that a venire panel's composition may put a petitioner on notice of a procedural irregularity in some instances."). In accordance with the District of South Carolina's (the "District") Amended Jury Selection Plan for the Random Selection of Petit Jurors, defense counsel received "[n]ames drawn from the qualified jury wheel for petit juries and completed questionnaires . . . seven calendar days before the jurors . . . appear[ed] at the courthouse", which in this case was on Monday, November 10, 2025. Order, *In re* Amended Jury Selection Plan for the Random Selection of Petit Jurors., 24-00406-RBH (D.S.C. Oct. 4, 2024), ECF No. 2-1 at 5 [hereinafter Amended Jury Selection Plan].

At that point, the jury panel consisted of 137 people. Of those 137 people, 8 identified as Black/African American, making up 5.8% of the panel. Then, after the Government submitted its and Mr. Wallace's strikes for cause, of which one applied to a member of the panel who identified as Black/African American, the panel was reduced to 52 people. Of those

---

Supp. 2d 1108, 1117 (C.D. Cal. 2013). Counsel for Mr. Wallace raised this fair cross-section claim prior to voir dire during a conference with the Court, however she did not file a motion, begging the question of whether potential relief under the JSSA is available to Mr. Wallace based on her verbal motion during the judicial conference. *See United States v. Jones*, 533 F. App'x 291, 299 (4th Cir. 2013) ("The JSSA allows a defendant to 'move to dismiss the indictment or stay the proceedings' in order to challenge the district's jury selection plan required by the JSSA. 28 U.S.C. § 1867(a). In criminal cases, the defendant must file the motion 'before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered . . . the grounds [for the motion], whichever is earlier.' *Id.* The JSSA allows the defendant to have discovery of records relating to jury selection process 'during the preparation and pendency' of a motion to stay the proceedings or dismiss the indictment under the statute. 28 U.S.C. § 1867(f)."). Resolving the timeliness of this Motion under the JSSA is not necessary at this point because the Motion is timely under the Sixth Amendment. Therefore, counsel leaves that issue for another day, if necessary.

52 people, only 1 of those who identified as Black/African American remained, making up 1.9% of the panel. 6 of the remaining 7 members of the panel who identified as Black/African American had been removed during the first random reduction of the panel. Additionally, people who identified as Black/African American were randomly removed at a substantially higher rate than other racial and ethnic groups. During the first random reduction of the pool from 225 people to 137 people, 9 of the 17 (52%) people who identified as Black/African American were removed compared to 2 of the 6 (33%) people who identified as Asian, 0 of the 2 (0%) people who identified as American Indian/Alaskan, and 77 of the 192 people who identified as White (40%).

During the second random reduction of the panel from 137 people to 52 people, 1 person who identified as Black/African American was struck for cause and 6 of the 7 remaining people who identified as Black/African American were randomly removed (85.71%). 1 of the remaining 4 people who identified as Asian was struck for cause. Of the remaining 3 people who identified as Asian, 1 was randomly removed (33%). Both of the people who identified as American Indian/Alaskan were struck for cause. 10 of the remaining 115 people who identified as White were struck for cause and 34 were randomly removed (29.56%).

Prior to these events, defense counsel was without reason to have constitutional concerns about the District's jury selection process. *See Ambrose*, 684 F.3d at 646 ("[R]equiring a defendant to make a contemporaneous objection based simply on an anecdotal view of the jury's racial composition defies logic; any individual panel could over represent a 'distinctive' group even though the group might be underrepresented in the jury venire as a whole. A gaze into the jury gallery tells you nothing and, in fact, can be misleading. To also suggest that an effective defense attorney must investigate the jury assembly process in every case conditioned upon his client's loss of the right is unnecessary and wasteful." (citation

omitted)). And while time and resources were spent on jury selection, it's not unusual for a Court to proceed with jury selection and allow counsel to file a motion challenging the venire after jury selection but before trial. *See United States v. Jones*, 533 F. App'x 291, 300 (4th Cir. 2013) ("Defendants did not move for discovery with respect to the jury selection process until 13 days after the verdict. . . . Defendants have not articulated any reason why they failed to seek discovery prior to trial, before the court spent time and resources on jury selection and trial."); *United States v. Jackman*, 46 F.3d 1240, 1243 (2d Cir. 1995) ("On September 14, 1993, the jury was scheduled to be selected for appellant's trial. Prior to the venire's entry into the courtroom, appellant objected to being required to select a jury from a venire that contained no Blacks and only a single Hispanic. Judge Covello instructed Jackman to file a written motion, but jury selection began, and a jury was selected from the venire as constituted. On September 21, 1993, prior to the swearing of the jury, the Court conducted an evidentiary hearing on appellant's motion."). Trial is the point of no return, which we haven't passed.

Although Mr. Wallace will only request discovery in this Motion, as a show of good faith, he briefly addresses the first two *Duren* prongs. Prong one requires little ink, as several courts have ruled that Black people are a "distinctive" group in the community. *See United States v. Savage*, 970 F.3d 217, 255 (3d Cir. 2020) ("We routinely recognize that Blacks qualify as a distinctive group. No further discussion is necessary on this point." (citations omitted)); *United States v. Royal*, 174 F.3d 1, 6 (1st Cir. 1999) ("There is no dispute that Royal has satisfied the first prong of this test; blacks are unquestionably a 'distinctive' group for the purposes of a fair cross-section analysis."); *United States v. Manbeck*, 514 F. Supp. 141, 148 (D.S.C. 1981) ("This court recognizes, as have courts previously dealing with the issue, that blacks and women are members of recognizable and distinct classes often singled out for different treatment under the laws.").

As to the second *Duren* prong, the representation of Black people among potential jurors is, at the very least, concerning when compared to the proportion of that group within "Area A" of the District. *See* Amended Jury Selection Plan, 24-00406-RBH (D.S.C. Oct. 4, 2024), ECF No. 2-1 at 1. Area A of the District is made up of the fourteen counties in South Carolina that are in the Anderson, Greenville, Greenwood, and Spartanburg divisions of the District. *See id.*; United States District Court District of South Carolina, *Explanation of Case Numbers*, https://www.scd.uscourts.gov/Filing/casenum.asp (last visited Nov. 20, 2025). To determine whether Black people are underrepresented among potential jurors, federal courts rely on statistical evidence.

> [N]either *Duren* nor any other decision of th[e] [United States Supreme] Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools. The courts below and the parties noted three methods employed or identified in lower federal court decisions: absolute disparity, comparative disparity, and standard deviation.

*Berghuis v. Smith*, 559 U.S. 314, 329 (2010). "'Absolute disparity' is determined by subtracting the percentage of African–Americans in the jury pool . . . from the percentage of African–Americans in the local, jury-eligible population . . . ." *Id.* at 323. "'Comparative disparity' is determined by dividing the absolute disparity by the group's representation in the jury-eligible population." *Id.*

Under the District's Amended Jury Selection Plan, voter registration lists "serve as the source for all grand and petit jurors serving in the district." Amended Jury Selection Plan, 24-00406-RBH (D.S.C. Oct. 4, 2024), ECF No. 2-1 at 2. For the purposes of this Motion, the population of jury-service-eligible Black people in Area A has been calculated using the voter

registration demographics of Area A.[2] As shown in the chart below, Area A has a total of 1,018,189 registered voters. Of those registered voters, 167,553 are Black people.

| Division | County | Registered Voters | Black Registered Voters | Percent of Black Voters |
|---|---|---|---|---|
| Anderson/Greenwood | Abbeville | 15,563 | 3,728 | 23.95% |
| Anderson/Greenwood | Anderson | 127,999 | 16,577 | 12.95% |
| Anderson/Greenwood | Edgefield | 17,672 | 5,055 | 28.60% |
| Anderson/Greenwood | Greenwood | 41,077 | 11,476 | 27.94% |
| Anderson/Greenwood | McCormick | 7,658 | 2,158 | 28.18% |
| Anderson/Greenwood | Newberry | 23,199 | 5,696 | 24.55% |
| Anderson/Greenwood | Oconee | 54,109 | 3,023 | 5.59% |
| Anderson/Greenwood | Pickens | 76,751 | 4,459 | 5.81% |
| Anderson/Greenwood | Saluda | 11,810 | 2,681 | 22.70% |
| Greenville | Greenville | 341,621 | 52,756 | 15.44% |
| Greenville | Laurens | 40,582 | 8,818 | 21.73% |
| Spartanburg | Cherokee | 33,455 | 6,468 | 19.33% |
| Spartanburg | Spartanburg | 210,858 | 39,965 | 18.95% |
| Spartanburg | Union | 15,835 | 4,693 | 29.64% |
| | **Total** | **1,018,189** | **167,553** | **16.46%** |

The jury panel for Mr. Wallace's case had 225 people total. Of those 225, 17 were Black people. Therefore, based on the formulas defined in *Berghuis*, by an absolute disparity (16.46%-7.5%), Black people were underrepresented in the panel from which Mr. Wallace's jury was selected by 8.96%. These same numbers result in a comparative disparity (8.96% ÷ 16.46%) of 54.4%, meaning Black people were 54.4% less likely, when compared to the overall jury-eligible population to be on the jury service list.[3] Similar disparities measures have been considered in several other circuits. The results are a mixed bag. Some courts find these levels

[2] These demographics are available at https://vrems.scvotes.sc.gov/Statistics/CountyAndPrecinct (last visited Nov. 20, 2025). The numbers appear to update as new people register to vote. Thus, these numbers are constantly changing.

[3] Defense counsel makes no claim to statistical expertise and begs forgiveness for any computation errors. Many claimants employ statisticians and other experts to meet the *Duren* standard. *See, e.g.*, *Berghuis v. Smith*, 559 U.S. 314, 323 at (2010) ("Isolating the month Smith's jury was selected, Smith's statistics expert estimated that the comparative disparity was 34.8%.App. 181a. In the 11 months after Kent County discontinued the district-court-first assignment policy, the comparative disparity, on average, dropped from 18% to 15.1%. *Id.,* at 102a–103a, 113a. Smith also introduced the testimony of an expert in demographics and economics, who tied the underrepresentation to social and economic factors."). However, for the purposes of this Motion, counsel, with great reluctance, performed the mathematical calculations defined in *Berghuis* to illustrate the potential viability of Mr. Wallace's Sixth Amendment fair cross-section claim.

of disparity reflect underrepresentation. Others do not. The Sixth Circuit Court of Appeals reviewed some of this caselaw in 2015:

> Here, the absolute disparity for African–Americans of 3.45% and corresponding 42% comparative disparity are sufficient to satisfy the *Duren* second prong. . . .
>
> . . . .
>
> Respondent argues that the disparities at issue here—3.45% and 1.66% absolute disparities, and 42% and 27.64% comparative disparities for African Americans and Hispanics, respectively—fail to show that the representation of African Americans and Hispanics in the jury venires were not "fair and reasonable." However, although Respondent points to numerous cases from other circuits in which courts have held that such numbers do not satisfy the *Duren* second prong, neither Supreme Court precedent, nor our prior decisions compel such a conclusion. . . .
>
> . . . .
>
> . . . . In [*United States v.*]*Rogers*, [73 F.3d 774, 776–77 (8th Cir. 1996),] an Eighth Circuit panel indicated that a comparative disparity of 30% would be sufficient to meet the underrepresentation prong of the *Duren* test where African–Americans comprised only 1.87% of the jury-eligible population. *Id.* at 776–77. Though the *Rogers* court noted that it was bound by precedent that had previously upheld the challenged Iowa jury-selection plan, the majority urged the court to revisit the precedent given the 30% comparative disparity figure. The court reasoned that, because the minority population comprised only 1.87% of the total population, comparative disparity was the most accurate measure of the underrepresentation. *Id.*

*Garcia-Dorantes v. Warren*, 801 F.3d 584, 602 (6th Cir. 2015). However, the Third Circuit Court of Appeals distinguished *Garcia-Dorantes*'s reasoning:

> This Court continues to use both absolute and comparative disparity methods, *see Howell*[*v. Superintendent Rockview SCI*], 939 F.3d [260,] 268–69 [(3d Cir. 2019)], because, when applied together, one method can be reasonably expected to offset the shortcomings of the other, *see Weaver*, 267 F.3d at 241–43. Nevertheless, taking our cues from *Duren* and persuasive authority, we have shown some solicitude for absolute disparity. *See id.* at 242 (observing it "seems to be the preferred method of analysis in most cases").
>
> We considered the interplay of absolute disparity and comparative disparity most recently in *Howell*, where Blacks comprised 10.7% of the relevant population. 939 F.3d at 266, 268. The absolute disparity of 5.83% was "lower than or similar to absolute disparities in other cases where courts have

> found no constitutional violation, and in fact, numerous courts have noted that an absolute disparity below 10% generally will not reflect unfair and unreasonable representation." *Id.* at 268 (collecting cases). We were also persuaded by authority determining that "comparative disparities similar to the comparative disparity in [*Howell*], 54.49%, were insufficient to demonstrate unfair and unreasonable representation." *Id.* (collecting cases). Evaluating the two statistical methods together in light of "factually similar cases," we concluded that Howell had not met his burden under *Duren*'s second prong. *Id.* at 269.
>
> . . . .
>
> Savage attempts to bolster his comparative disparity argument by briefly invoking out-of-circuit authority that sets a more modest standard for establishing unfair and unreasonable representation. In *Garcia-Dorantes v. Warren*, the Sixth Circuit decided that a habeas petitioner made the requisite showing based on a population percentage of 8.24%, an absolute disparity of 3.45%, and a comparative disparity of 42%, caused by a glitch in the electronic jury selection system. 801 F.3d 584, 590–93, 600, 603 (6th Cir. 2015). Because the disparities in Savage's case are somewhat larger, and the population percentage is somewhat higher, his case may clear the Sixth Circuit's second-prong hurdle. No matter, we must adhere to our own standard.
>
> . . . . Second, the *Garcia-Dorantes* court relied on non-Third Circuit precedent indicating that even more modest disparities met the second-prong standard. See 801 F.3d at 601–02 (citing *Smith v. Berghuis*, 543 F.3d 326, 336–39 (6th Cir. 2008), *rev'd on other grounds*, 559 U.S. 314 . . . (2010); *United States v. Rogers*, 73 F.3d 774, 776–77 (8th Cir. 1996)). We must look to Third Circuit caselaw, where Savage runs up against *Howell* and our other precedent. *Garcia-Dorantes* may inform our understanding of absolute and comparative disparities, but we are certainly not bound by it.

*Savage*, 970 F.3d at 256–58. Unfortunately, the Fourth Circuit's fair cross-section jurisprudence does not include such robust discussion of the statistical methodology applicable to these Sixth Amendment claims. Generally, the Fourth Circuit either doesn't address the second *Duren* prong or denies the claim based on insufficient evidence to satisfy the third *Duren* prong. *See, e.g.*, *United States v. Council*, 77 F.4th 240 (4th Cir. 2023); *United States v. Smith*, 51 F. App'x 415, 416 (4th Cir. 2002); *United States v. Tejada*, 172 F.3d 46 (4th Cir. 1999); *United States v. McGrady*, 173 F.3d 426 (4th Cir. 1999); *United States v. Wheeler*, 153 F.3d 725 (4th Cir. 1998); *Truesdale v. Moore*, 142 F.3d 749, 759 (4th Cir. 1998);

*Watkins v. Angelone*, 133 F.3d 920 (4th Cir. 1998); *United States v. Cecil*, 836 F.2d 1431, 1446 (4th Cir. 1988). Thus, the standard for establishing unfair and unreasonable representation in this Circuit is unclear. Still because the disparities present in Mr. Wallace's case have been found to establish underrepresentation in other circuits, evaluation of the District's jury selection processes is proper.

Accordingly, Mr. Wallace moves the Court to provide discovery on the District's jury selection process to determine whether Black people were systematically excluded in the jury-selection process. After jury selection, defense counsel advised the Court that Mr. Wallace wanted to both preserve his Sixth Amendment fair cross section argument *and* proceed to trial with the jury that was selected. Rightfully, the Court expressed skepticism at the ability to do both of those things at the same time and authorized the filing of this Motion. As Mr. Wallace cannot both preserve this claim and proceed to trial, he requests that the Court provide discovery to the parties on the District's jury selection processes. Only then can Mr. Wallace determine whether sufficient evidence exists to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement. The provision of discovery by the Court to the parties does not necessarily mean the trial cannot go forward on December 1, 2025, as planned. In *United States v. Manbeck*, the same review and adjudication that's requested by Mr. Wallace took place over two days:

> the court on January 27, 1981, ordered that the Clerk of the United States District Court for the District of South Carolina make available to the defendants, their attorneys and investigators, all records relating to jury selection. After the completion of an extensive investigation, a motion was filed on January 29, 1981, by some of the defendants, seeking a stay of the proceedings due to the improper selection of the petit jury.

514 F. Supp. at 143. And in *United States v. Jackman*, the district court handled the same issue in the week before trial:

> On September 14, 1993, the jury was scheduled to be selected for appellant's trial. Prior to the venire's entry into the courtroom, appellant objected to being

> required to select a jury from a venire that contained no Blacks and only a single Hispanic. Judge Covello instructed Jackman to file a written motion, but jury selection began, and a jury was selected from the venire as constituted. On September 21, 1993, prior to the swearing of the jury, the Court conducted an evidentiary hearing on appellant's motion.

46 F.3d at 1243. Of course, such timelines may not be feasible here. However, they're important to note, as Mr. Wallace has no desire to waste the resources of the Court, the Government, or the defense. He also won't waive his Sixth Amendment right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community—and all of its attendant benefits:

> The problem with eliminating the unique Sixth Amendment protection is that the Equal Protection Clause is concerned only with the particular damage wrought when the government discriminates. It does not encompass the Sixth Amendment's concern for the injury inflicted when a criminal defendant is deprived of the safeguard of the community's judgment. The constitutional value of the jury is obviated if the ultimate decision about life or liberty is made by a jury that does not represent the community. It is immaterial whether it is discrimination, accident, or an unexplainable factor that has produced that result: "[I]f the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool" the fair cross-section right is violated.
>
> The underrepresentation of African-Americans and Hispanics, in particular, diminishes the quality of deliberation about issues frequently relevant in criminal trials. Whites and people of color have, as a general rule, different life experiences based in part on race. There is substantial evidence, presumably as a result of those experiences, that people of color (again, as a group if not as individuals) have different perspectives on police and the justice system. The Supreme Court has recognized that jurors' deliberations are substantively enriched by the diverse perspectives brought to bear by people with different life experiences. This diversity of experience is particularly important because jurors do not simply decide the existence of objective facts, they make subjective judgments that depend on discretion, morality, determinations of credibility, and life experiences.

Nina W. Chernoff, *Wrong About the Right: How Courts Undermine the Fair Cross-Section Guarantee by Confusing It with Equal Protection*, 64 Hastings L. J. 141, 185–86 (2014) (footnotes omitted). Therefore, Mr. Wallace requests that the Court provide discovery to the

parties on the District's jury selection process to determine whether Black people are systematically excluded in the jury-selection process.

Respectfully submitted,

BY: *s/Judea S. Davis*
Judea Shechinah Davis (D.S.C. Fed. Bar #13440)
Assistant Federal Public Defender
75 Beattie Place, Suite 950
Greenville, South Carolina 29601
(864) 235-8714
judea_davis@fd.org

Greenville, SC
November 21, 2025